**BOARD OF TRUSTEES, MICHIGAN UNITED FOOD AND COMMERCIAL WORKERS UNIONS and Food Employers Joint Pension Fund, Plaintiffs-Appellees,**

v.

**EBERHARD FOODS, INC., Defendant-Appellant.**

No. 86–1232.

United States Court of Appeals, Sixth Circuit.

Argued April 23, 1987.

Decided Oct. 21, 1987.

Bradley Glazier, Clary, Nantz, Wood, Hoffius, Rankin and Cooper, Stephen J. Mulder (argued), Grand Rapids, Mich., for defendant-appellant.

Tammy S. Bawnik, Office of the Gen. Counsel, Pension Benefit Guar. Corp., Washington, D.C., for amicus curiae.

Theodore Sachs (argued), Detroit, Mich., for plaintiffs-appellees.

Before MERRITT, WELLFORD and NELSON, Circuit Judges.

MERRITT, Circuit Judge.

In this ERISA case the defendant employer withdrew from a multiemployer pension plan and now appeals from the District Court's affirmance of the arbitrator's decision upholding the plaintiff trustees' calculation of withdrawal liability. The only issue raised on appeal is whether the District Court erred in upholding the arbitrator's decision that the interest rate applied by the plan trustees in determining the employer's withdrawal liability was not unreasonable. Because we agree with the District Court and the arbitrator that the interest rate was not unreasonable, we uphold the decision of the District Court.

**I.**

This case arises from the withdrawal by one employer, Eberhard Foods, from a multiemployer pension fund, Michigan United Food and Commercial Workers Union and Food Employers Joint Pension Fund, a multiemployer pension plan covering employees and their beneficiaries in the retail supermarket industry in Michigan. The plan is administered under the Employee Retirement Income Security Act of 1974 (ERISA) as modified by the Multiemployer Pension Plan Amendments Act of 1980 (Multiemployer Act). *See* 29 U.S.C. § 1001 *et seq.* (1982).

A multiemployer fund covers the employees of a number of different employers. Pursuant to their collective bargaining agreements, the employers contribute to the fund, which in turn administers the pension plan and pays benefits to the plan participants. Membership in a multiemployer plan is one means by which an employer can offer pension benefits to its employees without administering those benefits itself.

Until 1981, Eberhard made periodic payments to the plan on behalf of its covered union employees. Pursuant to collective bargaining agreements which became effective in August 1981, Eberhard and its union employees agreed that new employees would participate in Eberhard's Employee Stock Ownership Plan and that contributions to the multiemployer plan would cease. The Employee Stock Ownership Plan is a single employer plan, covered by ERISA, which for a number of years was the plan covering Eberhard's non-union employees. Thus, effective August 1, 1981, Eberhard voluntarily withdrew from the plan. The Multiemployer Act provides that any employer must pay withdrawal liability when it withdraws from a multiemployer plan. In this case Eberhard disputes the amount of withdrawal liability that was assessed against it by the plan trustees.

The Multiemployer Act was "designed to promote benefit security for multiemployer plan participants through the melioration of the financial condition of multiemployer plans." H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 1, 51, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2919. Congress was primarily concerned with the financial effect on multiemployer plans of withdrawals by contributing employers. Before the passage of the Multiemployer Act, "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or [withdrew] from, multiemployer plans." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984).

The preamble to the Multiemployer Act, 29 U.S.C. § 1001a, expressly states that "withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations." 29 U.S.C. § 1001a(a)(4)(A). Congress established employer withdrawal liability both to provide a disincentive to withdrawals and to mitigate their effect by requiring a withdrawing employer to pay its fair share of a pension plan's unfunded vested benefits liabilities. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1022, 89 L.Ed.2d 166 (1986); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. at 723 n. 3, 104 S.Ct. at 2714 n. 3 (1984).

## II.

The question presented in this case is whether the amount of withdrawal liability assessed against Eberhard was unreasonable. Specifically, Eberhard challenges the six percent interest rate assumption applied by the plan's trustees, through an actuary, in calculating the withdrawal liability.

Under the Multiemployer Act, the trustees of the plan, through its actuary, initially calculate the amount of a withdrawing employer's withdrawal liability. This liability represents that employer's proportionate share of the plan's unfunded vested benefits, which are those benefits that are nonforfeitable by the plan participant but are as yet unfunded by the plan. Unfunded vested benefits specifically are defined under the Multiemployer Act as "an amount equal to (A) the value of nonforfeitable benefits under the plan, less (B) the value of the assets of the plan." 29 U.S.C. § 1393(c).

This calculation requires a determination of the present value of the vested payments as they will come due over time. The plan actuary must select an appropriate interest rate to apply in making that determination.

Increasing the interest rate assumption decreases the employer's withdrawal liability. A small adjustment in the interest rate assumption can lead to a major change in the withdrawal liability calculation. It is the reasonableness of this interest rate assumption which is at issue in this case.

In making the calculation in this case, the plan trustees assumed an interest rate of six percent. This six percent interest rate was applied by the plan's actuary in his most recent determination of the plan's minimum funding liability imposed by 26 U.S.C. § 412. Applying this six percent interest rate assumption, the trustees determined that the total unfunded vested benefits of the plan were approximately $84,000,000. Eberhard had contributed approximately 1.5% of plan assets and thus was assessed a withdrawal liability of 1.5% of the unfunded vested benefits, or $1,284,-000. Eberhard's sole dispute with the trustees' calculation of withdrawal liability is that the six percent interest rate assumption is unreasonably low.

Disputes between the withdrawing employer and trustees over the amount of withdrawal liability assessed are resolved initially in arbitration. *See* 29 U.S.C. § 1401(a)(1). Eberhard sought arbitration to dispute the trustees' six percent interest rate assumption. In the arbitration proceedings, the trustees' calculations "are presumed correct unless" the employer "shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A), (B) (1982).[1]

In this case, the arbitrator concluded that Eberhard had not met its burden of proving that the interest assumption was unreasonable. *Eberhard Foods, Inc.*, 6 Employ-

ee Benefits Cas. (BNA) 1961 (1985). The trustees filed a complaint in the District Court seeking enforcement of the arbitrator's award, and Eberhard counterclaimed seeking to vacate or modify the award. The Multiemployer Act provides that on completion of the arbitration proceedings, either party may bring suit in federal district court to "enforce, vacate, or modify an arbitrator's award." 29 U.S.C. § 1401(b)(2) (1982). The statute further provides that in an action in the district court brought under subsection (b), *"there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."* 29 U.S.C. § 1401(c) (1982) (emphasis added). The District Court granted the trustees' motion for summary judgment, finding that Eberhard "failed to establish by a clear preponderance of the evidence that the findings of fact made by the Arbitrator were not correct." Joint Appendix 20.

### III.

The series of presumptions prescribed by the Multiemployer Act were intended by Congress to "ensure the enforceability of employer liability. In the absence of these presumptions, employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element involved in making an actuarial determination." H.R.Rep. No. 869, pt. I, 96th Cong., 2d Sess. 1, 86, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2954.

In an attempt to circumvent these problems, Congress granted the presumption in favor of the trustees' calculation of withdrawal liability. *See* 29 U.S.C.

---

1. These provisions state in pertinent part:

    (3)(A) For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 1381 through 1399 of this title ... *is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.*

    (B) *In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct*

unless a party contesting the determination shows by a preponderance of evidence that —

    (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

    (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3) (1982) (emphasis added).

§ 1401(a)(3)(A) (1982). The burden of proof is on the employer. In meeting this burden, the test is not which withdrawal determination is the most reasonable but rather whether the challenged determination is unreasonable or clearly erroneous. *See id.*

As the First Circuit observed in *Keith Fulton & Sons v. New England Teamsters,* 762 F.2d 1137 (1st Cir.1985), the actual determination of withdrawal liability is not an exact science and therefore there is a range of reasonable actuarial determinations of withdrawal liability. *See id.* at 1142–43. Eberhard's actuary acknowledged this point, stating, "I don't think there is a single answer as to reasonableness. There is a range of reasonableness." (*Eberhard Foods, Inc.,* 6 Employee Benefits Cas. (BNA) at 1975 n. 57.) The statute does not anticipate that the actuary will always choose the figure the court would choose as the most reasonable from among this range. Rather, the only requirement is that in every case the actuarial determination will fall within the range of reasonableness—taking into account the unique characteristics of the fund.

Congress did establish guidelines for the trustees' determination of a reasonable withdrawal liability. The trustees must look to the standards set forth in 29 U.S.C. § 1393 in determining the proper liability. Section 1393 provides in pertinent part:

(a) Withdrawal liability under this part shall be determined by each plan on the basis of—

(1) *actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan*

. . . .

(b) In determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part, the plan actuary *may*—

(1) *rely on the most recent complete actuarial valuation used for purposes of section 412 of Title 26 and reasonable estimates for the interim years of the unfunded vested benefits,* and

(2) in the absence of complete data, rely on the data available or on data secured by a sampling which can reasonably be expected to be representative of the status of the entire plan.

29 U.S.C. § 1393 (1982) (emphasis added). This is also the standard which the arbitrator looks to in determining whether the employer has met its burden of proof that the withdrawal liability is unreasonable.

In this case, the plan's actuary applied a six percent interest rate—the same rate applied in the latest actuarial valuation of the plan for funding requirements under 26 U.S.C. § 412. This raises the question of the proper relationship between subsection (a)(1) which requires withdrawal liability determinations based on "actuarial assumptions and methods which, in the aggregate, are reasonable" and subsection (b)(1) which permits the actuary to "rely on the most recent complete actuarial valuation used for purposes of section 412 of Title 26." Section 412 of Title 26 prescribes the permissible method of determining the funding requirements of the plan. The language of 26 U.S.C. § 412 is exactly the same as the language of subsection (a)(1) of § 1393.

In this case, the plan trustees argue that § 1393(b)(1) should be interpreted to provide an irrebuttable presumption—a safe harbor—when the trustees choose to apply the same interest rate for withdrawal as they do for funding. The Pension Benefit Guaranty Corporation as amicus argues that § 1393(b)(1) should be interpreted to mean that the actuary is entitled to use the funding assumptions for calculating withdrawal liability unless the employer can show that the assumptions were not, in the aggregate, reasonable for *funding* purposes.

Moreover, subsection (a)(2) of § 1393 authorizes the Pension Benefit Guaranty Corporation to prescribe by regulation actuari-

al assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for "purposes of determining an employer's withdrawal liability." The Pension Benefit Guaranty Corporation has failed to adopt any regulations pursuant to this authority.

This issue of statutory construction is further complicated by the possible due process problems of the statutory presumptions generally. *See United Retail & Wholesale Emp. v. Yahn & McDonnell, Inc.*, 787 F.2d 128 (3d Cir.1986), *aff'd by equally divided vote*, — U.S. —, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). On the facts of this case, however, we are not required to address this question because the arbitrator performed an independent analysis of the interest rate assumption under § 1393(a)(1) and determined that the employer had not met its burden of showing that it was unreasonable.

At a minimum, the statute permits an actuary to apply the interest rate used for funding under 26 U.S.C. § 412 if that interest rate is reasonable in the withdrawal context. In other words, if the funding interest rate meets the requirements of subsection (a)(1)—"actuarial assumptions ... which, in the aggregate, are reasonable"—application of that interest rate would clearly be permissible under the statute. This analysis was performed by the arbitrator in this case.

Under the statutory scheme, the burden of proof is on the employer to demonstrate the unreasonableness of the trustees' determination of unfunded vested benefits. *See* 29 U.S.C. § 1401(a)(3)(B) (1982). The arbitrator found that Eberhard had not met its burden of proving that the trustees' use of the six percent interest rate was unreasonable:

> Based upon the foregoing, the Arbitrator determines that *Eberhard has not sustained by a preponderance of the evidence its burden of proof* to establish that the determination by the Fund of the [unfunded vested benefit liability] assessment is unreasonable or clearly erroneous, or that the actuarial assumptions and methods used in the determination

were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or that the plan's actuary made a significant error in applying the actuarial assumptions or methods.

6 Employee Benefits Cas. (BNA) at 1975 (emphasis added).

Findings of fact by the arbitrator are entitled to deference and may only be rebutted by a clear preponderance of the evidence. 29 U.S.C. § 1401(c) (1982).

Eberhard's arguments against the reasonableness of the trustees' interest rate assumption are basically twofold: (1) the differences between the basis for the funding and withdrawal calculation are so significant that use of the funding interest rate is inherently unreasonable in the withdrawal context, and (2) use of some form of "bond dedication" theory would provide a more reasonable estimate of withdrawal liability.

Eberhard's argument against the use of the funding assumption in the withdrawal context centers on the timing of benefits. Eberhard argues, and the plan trustees concede, that because the funding assumptions must take into account both vested and unvested benefits, in contrast to withdrawal liability which only considers vested benefits, the time horizon for withdrawal liability is somewhat shorter. The question is whether this shortened time frame makes the use of funding rates unreasonable in this case. Eberhard could not be arguing that in *every case* use of the funding rate would be unreasonable because Congress clearly contemplated otherwise in § 1393(b)(1), which specifically permits use of the funding assumptions. The arbitrator found, and we agree, that Eberhard had not met its burden of showing the specific differences between the two calculations as they relate *to this* plan that would make use of the funding interest rate unreasonable in calculating withdrawal liability. The six percent rate is consistent with historical interest rates over a long period of time, and we are unable to say that the trustees were unreasonable in concluding that future rates are more likely to approx-

imate long-term rates than the high rates prevailing during the past decade.

Eberhard's second argument centers on dedicating government bonds to the payment of withdrawal liability. Under this theory, the plan would be required to purchase government bonds and then apply the pay-out streams of those bonds to the withdrawal liability. This argument fails for a number of reasons.

First, the statutory scheme contemplates that the actuary will be determining an interest rate based on the unique characteristics of the plan—not dictating the future investment portfolio of the plan. Dedication of government bonds would place an increased burden and limit the investment flexibility of the plan administrator and financial advisor—something Congress was clearly trying to avoid. Second, from the contradictory testimony adduced at the hearing, it is unclear whether the dedication theory would in fact be reasonable in the context of an ongoing plan. Most importantly, as discussed above, the employer is not entitled to what we as judges would say is the best or *most* reasonable method of calculating withdrawal liability. Rather, the employer is only entitled to complain if he proves that the actuarial assumptions applied by the trustees in the aggregate are *unreasonable.*

The arbitrator properly focused on the elements put forth in 26 U.S.C. § 412 and 29 U.S.C. § 1393(a)(1)—the experience of the plan and reasonable expectations. We agree with the District Court and the arbitrator that Eberhard has failed to meet its burden of showing that use of the six percent funding interest rate was unreasonable for this plan. We do not believe this finding was erroneous.

Eberhard also argues that the Supreme Court's decision in *Pension Benefit Guaranty Corp. v. Yahn & McDonnell, Inc.,* — U.S. ——, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (per curiam), precludes us from applying the statutory presumptions in this case. We disagree. In *Yahn,* the Supreme Court upheld by an equally divided vote the Third Circuit's decision that a similar statutory presumption in favor of the

trustees' calculation was unconstitutional. However, an affirmance by an equally divided Court is without precedential effect. *See Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 378–79, 34 L.Ed.2d 401 (1972). Thus, we are left with a split in the circuits on the question of the constitutionality of the presumptions. The other circuits who have considered the question have upheld the presumptions against constitutional attack. *See Keith Fulton & Sons v. New England Teamsters,* 762 F.2d 1137, 1140–43 (1st Cir.1985) (*en banc*); *Board of Trustees v. Thompson Bldg. Materials, Inc.,* 749 F.2d 1396, 1403–04 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1511 (D.C.Cir.1984); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 855 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984); *Republic Indus. v. Teamsters Joint Council,* 718 F.2d 628, 639–41 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Accordingly, had this issue been properly presented in this case, we would have been required to decide this difficult question without guidance from the Supreme Court.

Unfortunately, the constitutionality of the presumption was not properly raised in this litigation. Moreover, had the issue been properly raised and briefed, we would have been collaterally estopped from considering it. On May 26, 1983, Judge Gibson of the United States District Court for the Western District of Michigan addressed numerous constitutional challenges to the presumptions raised by Eberhard against the appellee plan in this case. *See Eberhard Foods, Inc. v. Retail Store Employees Unions,* 4 Employee Benefits Cas. (BNA) 1544 (W.D.Mich.1983).

In that case, suing for a preliminary injunction, Eberhard challenged the Multiemployer Act as unconstitutional on many grounds: (1) denying the right to jury trial, (2) violating the Contract Clause, (3) depriving Eberhard of property without due process of law, (4) taking property without

just compensation, (5) violating substantive due process, and (6) violating the Equal Protection Clause. *See id.* at 1545–46. The District Court rejected all of Eberhard's challenges. *Id.* at 1546. Eberhard initially appealed but later withdrew the appeal. Hence, the issue of constitutionality was litigated between these parties in a context where the determination of constitutionality was essential to the judgment. According to the well-established principles of collateral estoppel, Eberhard may not now raise the same issue against the same party. *See, e.g., Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

For these reasons, we uphold the decision of the District Court enforcing the arbitrator's decision.

WELLFORD, Circuit Judge, dissenting:

Judge Merritt has set out well the background of the dispute in this case involving the complex and opaque Multiemployer Pension Plan amendments Act of 1980 (MPPAA), 29 U.S.C. § 1001 *et seq.* (1982).[1] He recited the essentials:

> Eberhard sought arbitration to dispute the trustee's six percent interest rate assumption. In the arbitration proceedings, the trustee's calculations "are presumed correct unless" the employer "shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A), (B) (1982).
>
> In this case, the arbitrator concluded that Eberhard had not met its burden of proving that the interest assumption was unreasonable. *Eberhard Foods, Inc.,* 6 Employee Benefits Cas. (BNA) 1961 (1985). The trustees filed a complaint in the District Court seeking enforcement of the arbitrator's award, and Eberhard

counterclaimed seeking to vacate or modify the award. The Multiemployer Act provides that on completion of the arbitration proceedings, either party may bring suit in federal district court to "enforce, vacate, or modify an arbitrator's award." 29 U.S.C. § 1401(b)(2) (1982). The statute further provides that in an action in the district court brought under subsection (b), *"there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."* 29 U.S.C. § 1401(c) (1982) (emphasis added). The District Court granted the trustee's motion for summary judgment, finding that Eberhard "failed to establish a clear preponderance of the evidence that the findings of fact made by the Arbitrator were not correct."

(Footnote omitted).

Because I am persuaded that the statutory presumptions in the Act, with respect to what I deem to be discretionary and potentially interested acts of the trustees in setting withdrawal interest rates, deprive Eberhard of procedural due process under the Constitution, I would reverse and remand the case for a further consideration of a reasonable interest rate to be applied for withdrawal liability calculation as to Eberhard. My views in this respect coincide with those expressed by Judge Becker in *United Retail & Wholesale Emp. v. Yahn & McDonnell,* 787 F.2d 128 (3d Cir. 1986), *aff'd by equally divided vote,* —— U.S. ——, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987), and the views in dissent expressed by Judge Aldrich in *Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Industry Pension Fund,* 762 F.2d 1124, 1137 (1st Cir.1985). *See also Robbins v. Pepsi-Cola Metro Bottling Co.,* 636 F.Supp. 641 (N.D.Ill.1986).[2]

---

1. One of the authorities cited in a supplemental addendum to the brief of appellee in this case, *Fraser Shipyards, Inc. and IAM National Pension Fund,* 7 EBC 2562, 2583 (1986), describes the MPPAA as "one of the most unpopular enactments of our day; no law in recent memory has been assailed so frequently and so passionately...."

2. I tend to agree with Judge Nordberg in *Robbins,* 636 F.Supp. at 676, that the presumptions contained in § 1401(a)(3)(A) and (B) of MPPAA violate the due process rights of Eberhard with respect to statutory presumptions of correctness, including the presumption granted the arbitrator's determination.

I would hold the presumptions of correctness given the trustees' assessment of liability should be stricken as inconsistent with procedural due process, and that "consistent with due process, the arbitrators cannot accord *any* presumption of correctness to the withdrawal liability assessments determined and calculated by the trustees of a pension fund." *Robbins*, 636 F.Supp. at 676.

The trustees, in my view, have a potential personal interest "to maximize withdrawal liability of employers," and cannot be deemed to be an "impartial decisionmaker." *Yahn*, 787 F.2d at 138. Being potentially liable themselves to the fund, there is some conflict of interest in the trustee's assessment of a very low and conservative interest rate against withdrawing employers. *See Yahn*, 787 F.2d at 139; *Massachusetts Mutual Life Ins., Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). "The trustees' factual determinations and discretionary judgments, which must indisputably be reviewed deferentially in both arbitration and the district court, are critical to assessments of withdrawal liability." *Yahn*, 787 F.2d at 135 n. 9. I would set aside and sever that part of the statute requiring such a presumption and deferential treatment as unconstitutional, but retain the remainder of the statutory scheme.

Interestingly, another of the cases cited by appellees as a supplement to their brief, *Joseph Aronauer, Inc. and United Furniture Workers Pension Fund A*, (AAA Case No. 1362 00584 (O'Loughlin 1985), involved an arbitrator's decision applying the presumption in controversy. It approved a 7% funding rate instead of the 6% approved in the instant case, and noted that "since the rate under review is *in excess of 6%*, it appears that the Plan is in line as far as future expectations are concerned." (Slip op. 62, 63) (emphasis added). The expert, Grubb, who testified for appellant Eberhard, also testified in *Aronauer* that he had no objection to 7% as a funding rate. The arbitrator inferred that a rate above 6% was the developing "norm" or "consensus" in April of 1985 in *Aronauer*.[3]

Accordingly, I would reverse and remand this matter to the arbitrator with the direction that he proceed to determine, without any presumption of correctness given the trustees' assessment, whether the 6% withdrawal rate utilized was unreasonable and arbitrary under the circumstances and the record.

---

**3.** The rate applied in *Keith Fulton* was 7.5%.